UNITED STATES of America,
Plaintiff–Appellant,

v.

Scott L. NICHOLS; Ronald W. Bouck, also known as Little Ronnie, also known as LR; Gary G. Barnett, also known as Bam Bam; Cory Day, also known as Daylight, also known as DL; Gary A. Fisher; Kevin L. Hoffman; David Palomino, Defendants–Appellees,

and

James Jay Bobo; Van T. Duke; Mark H. Feltman; Cindy S. Fenton; Donald A. Fenton; Debra Ann Filipe; Paul D. Hunt, also known as C St.; Ronald Iriarte, also known as Big Ronnie, also known as Richard Lopez; Rudolfo Lema, also known as RD; Nannette Mackelprang; Perfecto Russell Montoya; Augusto A. Penaloza; Jill Shayne; Randall C. Stephens, also known as Chuck, also known as CH; Claude W. Taylor, also known as Arnold, also known as AR; Steven R. Taylor, also known as Ranch; John Mark Valgardson; Mark L. West; John Doe, also known as Nicholas Crowder; Geovani Cordano; Kevin A. Reynolds, Defendants.

Nos. 87–1459, 87–1743.

United States Court of Appeals,
Tenth Circuit.

March 10, 1988.

Rehearing Denied April 22, 1988.

William J. Landers, Deputy Associate Atty. Gen. (William F. Weld, Asst. Atty. Gen., and Brent D. Ward, U.S. Atty., with him on the briefs), for plaintiff-appellant.

G. Fred Metos, of Yengich, Rich, Xaiz & Metos, Salt Lake City, Utah, for defendant-appellee Scott L. Nichols.

Stephen J. Eisenberg, of Eisenberg Law Offices, S.C., Madison, Wis., for defendant-appellee David Palomino.

Kenneth R. Brown, Salt Lake City, Utah, for defendant-appellee Cory Day.

Kevin J. Kurumada, Salt Lake City, Utah, for defendant-appellee Gary A. Fisher.

Colin P. King, of Giauque, Williams, Wilcox & Bendinger, Salt Lake City, Utah, for defendant-appellee Kevin L. Hoffman.

Before LOGAN, McWILLIAMS, and TACHA, Circuit Judges.

TACHA, Circuit Judge.

Congress provided in the Comprehensive Crime Control Act of 1984 that anyone convicted of a federal drug felony must forfeit any fruits of that crime and any property used in the commission of the crime to the federal government. The United States appeals from a decision of the district court holding that, while Congress did not intend to exempt attorneys' fees from forfeiture, the act violates the sixth amendment right to choice of counsel to the extent that the act requires the forfeiture of assets that would otherwise be paid to an attorney representing the defendant in the charged offense. We conclude that the act is constitutional and reverse.

## I. CRIMINAL FORFEITURE LAW

In 1984 Congress amended federal criminal forfeiture law. These amendments are best understood within the historical context of forfeiture. *See generally Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 680–86, 94 S.Ct. 2080, 2090–94, 40 L.Ed.2d 452 (1974); *United States v. Sandini*, 816 F.2d 869, 872–73 (3d Cir.1987). There are two types of forfeiture: criminal and civil. A civil forfeiture proceeding is an *in rem* action against the property that the government seeks to obtain. The guilt or innocence of the property owner is irrelevant in a civil action because the theory is that the property itself has committed the wrong. *Calero-Toledo*, 416 U.S. at 680–81, 94 S.Ct. at 2090–91. Further, because the property is considered tainted upon the commission of the wrongful act, the interest of the government vests at the time of the act.

Conversely, criminal forfeiture is *in personam:* it operates against a convicted criminal defendant. The historical English use of criminal forfeiture provided that a defendant convicted of treason or a felony forfeited his entire estate to the crown. As Blackstone wrote, this practice rested on the belief that "all property is derived from society," so that if "a member of any national community violates the fundamental contract of his association, by transgressing the municipal law, he forfeits his right to such privileges as he claims by that contract." 1 W. Blackstone, *Commentaries* *299.

Civil forfeiture has been widely used in the United States. Typically the government has been permitted to seek the forfeiture of contraband or harmful instrumentalities employed in an illegal activity. Civil forfeiture proceedings are available to

obtain "virtually any type of property that might be used in the conduct of a criminal enterprise." *Calero–Toledo*, 416 U.S. at 683, 94 S.Ct. at 2091–92; *see generally* Hughes & O'Connell, *In Personam (Criminal) Forfeiture and Federal Drug Felonies: An Expansion of a Harsh English Tradition into a Modern Dilemma*, 11 Pepperdine L.Rev. 613, 618 (1984) (citing federal civil forfeiture statutes).

Criminal forfeiture, on the other hand, was employed infrequently in the United States before 1970. Much of the traditional hostility to criminal forfeiture in this country was the result of the use of the practice in England. The Founding Fathers rejected the English practice of forfeiture of estate for several reasons. *See* Note, *Forfeiture of Attorneys' Fees: Should Defendants Be Allowed to Retain the "Rolls Royce of Attorneys" with the "Fruits of the Crime"?*, 39 Stan.L.Rev. 663, 666 n. 20 (1987). In particular, concern about the effect of forfeiture on a defendant's family members and heirs resulted in the constitutional provision that "no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted." U.S. Const. art. III, § 3. The First Congress prohibited forfeiture of estate as a criminal punishment. Act of April 30, 1790, ch. 9, § 24, 1 Stat. 112, 117. Then, between 1790 and 1970, Congress provided for criminal forfeiture only once: to recover the life estates of Confederate soldiers. The Supreme Court upheld this statute as constitutional. *Bigelow v. Forest*, 76 U.S. (9 Wall.) 339, 19 L.Ed. 696 (1869); *Miller v. United States*, 78 U.S. (11 Wall.) 268, 20 L.Ed. 135 (1870).

The Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 853, and the Organized Crime Control Act of 1970, 18 U.S.C. § 1963, reintroduced criminal forfeiture into federal law. The 1970 statutes were enacted in response to widespread concern about the flow of illegal drugs and the activities of organized crime. In particular, Congress targeted professional criminals and the leaders of illicit drug empires and organized crime. The Drug Abuse Act imposed criminal sanctions on "continuing criminal enterprises" (CCE) active in the distribution of illegal drugs; the Organized Crime Control Act was aimed at "racketeer influenced and corrupt organizations" (RICO) prevalent in organized crime. Congress recognized that traditional criminal sanctions had failed to destroy active drug trafficking and other illegal activities. Therefore, both of the acts created new tools to combat the profitability of the sales of illegal drugs and the wide-ranging activities of organized crime. *See United States v. Turkette*, 452 U.S. 576, 588–89, 101 S.Ct. 2524, 2531–32, 69 L.Ed.2d 246 (1981) (interpreting RICO).

The criminal forfeiture provisions were the most promising of the devices enacted in the 1970 acts. "[I]n introducing forfeiture into federal criminal law, Congress sought to dissuade individuals from pursuing criminal gain and to eradicate the economic power bases making possible organized criminal and drug-related activities." *United States v. McKeithen*, 822 F.2d 310, 313 (2d Cir.1987) (footnote omitted). Thus, criminal forfeiture was designed both to penalize and to deter criminal activity. A defendant convicted of a CCE violation was required to forfeit any "profits" obtained through certain drug offenses, 21 U.S.C. § 848(a)(2)(A), and a defendant convicted of a RICO violation was required to forfeit any "interest" acquired through the prohibited conduct, 18 U.S.C. § 1963(a). *See Russello v. United States*, 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("interest" includes the proceeds produced by an illegal enterprise).

Despite the new provisions, the drug problem continued unabated, and it was obvious that the much-heralded criminal forfeiture procedures had been ineffective in deterring either illegal drug trafficking or organized crime. Only ninety-eight CCE and RICO cases, involving about two million dollars in actually or potentially forfeitable assets, were brought between 1970 and March 1980. General Accounting Office, *Asset Forfeiture—A Seldom Used Tool in Combatting Drug Trafficking* ii (1981) [hereinafter GAO Report]. In com-

parison, illegal drugs generated an estimated sixty billion dollars annually. *Id.* at i. As one observer later remarked, the amount of assets forfeited was but "a scandalous pittance when measured against the vast potential." President's Commission on Organized Crime, *The Impact: Organized Crime Today* 216 (1986) (statement of Commissioner Methvin).

Congress responded by investigating the use of the criminal forfeiture procedures. *See Forfeiture in Drug Cases: Hearings Before the Subcomm. on Crime of the Comm. on the Judiciary House of Representatives*, 97th Cong., 1st & 2d Sess. (1981–82) [hereinafter House Hearings]; *Forfeiture of Narcotics Proceeds: Hearings Before the Subcomm. on Criminal Justice of the Comm. on the Judiciary United States Senate*, 96th Cong., 2d Sess. (1980) [hereinafter Senate Hearings]. Many shortcomings in the existing statutes were identified. *See generally* S.Rep. No. 98–225, 98th Cong., 1st Sess. 194–97 [hereinafter S.Rep.], *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3377–80. The most significant shortcoming was the inability of the government to prevent the transfer of potentially forfeitable property to third parties and to obtain any such property once it had been transferred. A restraining order was not available until after an indictment had been issued listing property that could be forfeited, yet the government routinely notified subjects of pending grand jury deliberations to allow them an opportunity to appear before the grand jury. Once notified, a potential defendant was able to transfer or conceal his or her assets. Although the government could seek a restraining order once an indictment was filed, courts had developed different procedures for issuing a restraining order in the absence of a statutorily described procedure. *See* Reed, *Criminal Forfeiture Under the Comprehensive Forfeiture Act of 1984: Raising the Stakes*, 22 Am.Crim.L.Rev. 747, 761 n. 83 (1985) (citing cases). Moreover, a defendant would be subject only to a contempt citation if he or she transferred listed property after a restraining order was issued.

In 1984 Congress amended the criminal forfeiture provisions by enacting the Comprehensive Crime Control Act as an amendment to a continuing appropriations act. The new forfeiture provisions were written to eliminate the problems that arose under the original acts.[1] First, the amended provisions expanded the substantive sweep of criminal forfeiture. The number of offenses subject to criminal forfeiture was expanded to include an estimated twenty-five percent of the criminal cases brought in federal court. *See* Hughes & O'Connell, 11 Pepperdine L.Rev. at 626. In particular, all federal drug felonies are now subject to criminal forfeiture. 21 U.S.C. § 853(a); *see also* 18 U.S.C. § 1961 (certain federal obscenity and financial reporting crimes now subject to criminal forfeiture). Second, the amendments expanded the scope of property subject to forfeiture by including as forfeitable any "property used, or intended to be used" in the commission of a drug offense. 21 U.S.C. § 853(a)(2). Additionally, the amendments established procedures allowing for the issuance of a restraining order before, at the time of, or after the filing of an indictment. 21 U.S.C. § 853(e); 18 U.S.C. § 1963(d); *see United States v. Harvey*, 814 F.2d 905, 910 (4th Cir.1987) (describing the procedures to be followed in issuing an injunction or a restraining order), *rev'd on other grounds sub nom. In re Caplin & Drysdale*, 837 F.2d 637 (4th Cir.1988) (en banc); *United States v. $39,000 in Canadian Currency*, 801 F.2d 1210, 1219 (10th Cir.1986) (same).

■ The 1984 amendments also included a relation back provision:

All right, title, and interest in property described in subsection (a) of this section vests in the United States upon the commission of the act giving rise to forfeiture under this section. Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered for-

---

**1.** An exhaustive discussion of the changes to the criminal forfeiture laws made by the 1984 amendments appears in Reed, 22 Am.Crim.L. Rev. at 750–76.

feited to the United States, unless the transferee establishes in a hearing pursuant to subsection (n) of this section that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.

21 U.S.C. § 853(c); *see also* 18 U.S.C. § 1963(c) (same provision for RICO). The relation back provision essentially borrows the concept of taint from civil forfeiture. Thus, the government's interest in the property to be forfeited vests at the time the crime is committed, rather than upon conviction, as had previously been the case with the CCE and RICO criminal forfeiture provisions.[2]

## II. FACTS

On October 23, 1986, twenty-six individuals, including the appellees in this case, were indicted by a federal grand jury in Utah for various offenses arising out of illegal trafficking in cocaine. Each of the defendants was charged with conspiracy to distribute a controlled substance in violation of 21 U.S.C. § 846. Some defendants were also charged with distribution of and possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1), interstate travel in aid of an unlawful activity, 18 U.S.C. § 1952, unlawful use of a communication facility, 21 U.S.C. § 843(b), engaging in a continuing criminal enterprise, 21 U.S.C. § 848, and aiding and abetting, 18 U.S.C. § 2.

The indictment included a forfeiture provision pursuant to 21 U.S.C. § 853. Assets identified as subject to forfeiture included "(1) any property constituting or derived from any proceeds said defendant obtained, directly or indirectly, as the result of such violation, and (2) any of said defendant's property used or intended to be used, in any manner or part, to commit or to facilitate the commission of such violation." The indictment also listed certain specific property, including Nichols's interest in a

$100,000 certificate of deposit, $80,010 in cash found in a Salt Lake County motel, a twenty-three foot Sleekcraft Executive boat with Roadrunner trailer, and a 1983 Ford Bronco. Finally, the indictment identified $21,300 cash seized from Palomino's residence in Florida.

The government obtained a restraining order on November 7 prohibiting the defendants from "pledging, distributing, encumbering, or otherwise disposing of or removing from the jurisdiction" of the court any of the property specified in the forfeiture count of the indictment. Several defendants, including the appellees now before this court, moved to exempt any assets needed to pay attorneys' fees from the restraining order and from potential forfeiture. The district court heard argument on these motions before trial and took the motions under advisement.

The eight defendants who went to trial were convicted on March 2, 1987. On the same day, the district court issued an opinion ruling on the appellees' motions. *United States v. Nichols*, 654 F.Supp. 1541 (D.Utah 1987). On statutory grounds, the court held that the criminal forfeiture provisions of the 1984 act do not exclude from forfeiture assets transferred to an attorney. *Id.* at 1556. On constitutional grounds, however, the court held that the criminal forfeiture provisions violated a defendant's sixth amendment right to choice of counsel. *Id.* at 1558–59. The court ordered the exemption of assets otherwise subject to forfeiture to the extent necessary to pay reasonable attorneys' fees. *Id.* at 1559. The district court also held that the use of the civil forfeiture statute, 21 U.S.C. § 881, in conjunction with a criminal prosecution violates the appellees' right to choice of counsel for the same reasons that the criminal forfeiture statute is invalid. 654 F.Supp. at 1559–61. Finally, the court held the attorney appointed to represent Kevin Hoffman was entitled to a reasonable fee to be paid from assets that would

---

**2.** Section 853(c) was enacted in response to decisions holding that the relation back concept did not apply in criminal forfeiture proceedings. *See, e.g., United States v. Alexander*, 741 F.2d 962, 967–68 (7th Cir.1984), *overruled, United States v. Ginsburg*, 773 F.2d 798 (7th Cir.1985) (en banc), *cert. denied*, 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986).

otherwise be forfeited to the government by Hoffman. *Id.* at 1562.

The United States appeals from the district court's March 2 order in No. 87–1459. The government also appeals from two subsequent district court orders related to the claims of Stephen Eisenberg, attorney for David Palomino, in No. 87–1743. Eisenberg contends that the government's appeal is untimely.

The government seized $21,300 from Palomino's residence on October 29, 1986. The government retained this property during the pendency of the forfeiture claim. On April 7, 1987, the district court ordered the government to release the $21,300 to Eisenberg "upon the filing of adequate security" by Eisenberg in order to protect the government's claim to the assets pending appeal. The court approved the surety offered by Eisenberg on May 15. The government filed a notice of appeal from the April 7 and May 15 orders on May 18.

The government's appeal in No. 87–1743 is timely. The April 7 order was not a final order. By its own terms, the order required Eisenberg to post security before the government released the funds. As soon as Eisenberg provided the necessary security, the district court ordered the release of the funds, and the government promptly appealed.

### III. ISSUES ON APPEAL

This case is one of many involving the application of the criminal forfeiture provisions to property that a defendant wants to use to retain an attorney. The issues involved here have divided courts and commentators and have evoked apocalyptic protests from the bar. The arguments have generally focused on two issues. The first issue is whether, on statutory grounds, Congress intended to exempt attorneys' fees from the criminal forfeiture provisions in 1984. The second issue is whether these amendments deny a defendant's sixth amendment right to counsel when applied to payments made to an attorney.

The courts and commentators that have addressed the issue are divided on both the statutory and the constitutional questions. The courts that have considered the issue have done so in a variety of contexts, but it is possible to summarize the general conclusions they have reached. Many district courts have held that the statute must be read to exempt from forfeiture assets a defendant uses to retain an attorney. *United States v. Madeoy,* No. 86–0377 (D.D.C. Oct. 2, 1987) (WESTLAW, Allfeds database [1987 WL 32]); *United States v. Truglio,* 660 F.Supp. 103 (N.D.W.Va.1987); *United States v. Estevez,* 645 F.Supp. 869 (E.D.Wis.1986); *United States v. Figueroa,* 645 F.Supp. 453 (W.D.Pa.1986); *United States v. Ianniello,* 644 F.Supp. 452 (S.D. N.Y.1985); *United States v. Badalamenti,* 614 F.Supp. 194 (S.D.N.Y.1985); *United States v. Rogers,* 602 F.Supp. 1332 (D.Col. 1985); *see also United States v. Thier,* 801 F.2d 1463, 1474 (5th Cir.1986), *modified,* 809 F.2d 249 (5th Cir.1987) (statute allows attorney to recover reasonable fees from forfeited assets, but assets needed to pay an attorney need not be exempted from pretrial restraints). Other courts have concluded that the statute does not exempt attorneys' fees and that it is not unconstitutional to require a defendant to forfeit assets that would otherwise be paid to an attorney. *In re Caplin & Drysdale,* 837 F.2d 637 (4th Cir.1988) (en banc); *United States v. Monsanto,* 836 F.2d 74 (2d Cir. Dec. 21, 1987); *United States v. Bailey,* 666 F.Supp. 1275 (E.D.Ark.1987); *In re Grand Jury Subpoena Duces Tecum Dated January 2, 1985 (Payden v. United States),* 605 F.Supp. 839, 849–50 n. 14 (S.D. N.Y.1985), *rev'd on other grounds,* 767 F.2d 26 (2d Cir.1985). The commentators who have addressed the issue have reached similarly diverse conclusions.[3]

---

**3.** Our analysis is aided by a wealth of academic discussions of the application of the 1984 criminal forfeiture provisions to attorneys' fees. As the courts have split on the question, so have the commentators. Some have concluded that the statute should be read to exempt attorneys' fees from forfeiture because of various constitutional concerns. *See* Note, *Forfeiture of Attorneys' Fees: Should Defendants Be Allowed to Retain the "Rolls Royce of Attorneys" with the "Fruits of the Crime"?,* 39 Stan.L.Rev. 663 (1987); Note, *The Criminal Forfeiture Provisions of the*

We must decide two questions on appeal. First, we must decide whether the criminal forfeiture provisions of the 1984 amendments exempt from forfeiture assets transferred by a defendant to an attorney. Second, if the statute does not provide for an exemption, we must decide whether the appellees' sixth amendment right to counsel was violated by the application of the criminal forfeiture provisions in this case.[4]

## IV. STATUTORY CONSTRUCTION OF THE 1984 ACT

The district court held that the statute does not exempt attorneys' fees from forfeiture. 654 F.Supp. at 1556. The appellees contend that this decision is in error. If the statute does exempt attorneys' fees, we do not need to consider the constitution-al challenges to the statute. We will not decide a constitutional question unless it is necessary to do so. *See, e.g., Cartwright v. Maynard,* 822 F.2d 1477, 1479 (10th Cir. 1987), *cert. granted,* — U.S. —, 108 S.Ct. 693, 98 L.Ed.2d 645 (1988). Accordingly, we first examine the statute.

The determination of the scope of a statute begins with its plain language. *Russello,* 464 U.S. at 20, 104 S.Ct. at 299 (interpreting RICO); *Turkette,* 452 U.S. at 580, 101 S.Ct. at 2527 (interpreting RICO). Indeed, in most instances, a court need not go beyond the words of the statute. *Harvey,* 814 F.2d at 913. We look beyond the words Congress has chosen in only a limited number of circumstances. If the language of the act is ambiguous, we will

---

*RICO and CCE Statutes: Their Application to Attorneys' Fees,* 19 U.Mich.J.L. Reform 1199 (1986); Note, *Against Forfeiture of Attorneys' Fees Under RICO: Protecting the Constitutional Rights of Criminal Defendants,* 61 N.Y.U.L.Rev. 124 (1986); Viles, *Criminal Procedure IV: Attorney's Fees Forfeiture and Subpoenaing Defendants' Attorneys,* 1986 Ann.Surv.Am.Law 335 (1986); Reed, *Criminal Forfeiture Under the Comprehensive Forfeiture Act of 1984: Raising the Stakes,* 22 Am.Crim.L.Rev. 747, 776–81 (1985). Other commentators have concluded that it would be unconstitutional to apply the forfeiture provisions of the statute to attorneys' fees. Cloud, *Forfeiting Defense Attorneys' Fees: Applying an Institutional Role Theory to Define Individual Constitutional Rights,* 1987 Wis.L.R. 1; Note, *Attorneys' Fee Forfeiture Under the Comprehensive Forfeiture Act of 1984: Can We Protect Against Sham Transfers to Attorneys?,* 62 Notre Dame L.Rev. 734 (1987); Comment, *RICO and the Forfeiture of Attorneys' Fees: Removing the Adversary from the Adversarial System?,* 62 Wash.L.Rev. 201 (1987); Note, *Attorney Fee Forfeiture,* 86 Colum.L.Rev. 1021 (1986). Several commentators have concluded that the statute reaches attorneys' fees and that it is not unconstitutional to require the forfeiture of assets that would otherwise be transferred to an attorney. *See* Brickey, *Forfeiture of Attorneys' Fees: The Impact of RICO and CCE Forfeitures on the Right to Counsel,* 72 Va.L.Rev. 493 (1986); Note, *Forfeiture of Attorneys' Fees: A Trap for the Unwary,* 88 W.Va.L.Rev. 825 (1986); Comment, *Today's RICO and Your Disappearing Legal Fee,* 15 Cap.U.L.Rev. 59 (1985). Other commentators have concluded that the forfeiture of attorneys' fees is not necessarily unconstitutional but recommend that a pretrial hearing be held to determine which assets are subject to forfeiture. *See* Pate, *Payment of Attorneys' Fees with Potentially Forfeitable Assets,* 22 Crim.L.Bull. 326 (1986); Note, *Forfeiture of Attorneys' Fees Under*

*RICO and CCE,* 54 Fordham L.Rev. 1171 (1986); Note, *Forfeitability of Attorney's Fees Traceable as Proceeds from a RICO Violation under the Comprehensive Crime Control Act of 1984,* 32 Wayne L.Rev. 1499 (1986).

4. The appellees do not raise a due process challenge to the statutory procedures for the issuance of a restraining order. The appellees argue that the application of the criminal forfeiture provisions of the 1984 act to assets a defendant seeks to use to obtain an attorney violates the defendant's constitutional right to counsel of choice, and accordingly, a restraining order must exempt assets necessary to pay an attorney. Conversely, the argument that a restraining order violates due process applies to *any* intended use a defendant's assets, not just transfers to an attorney. As we observed in *United States v. $39,000 in Canadian Currency,* 801 F.2d at 1218–19 n. 6, the Ninth Circuit has held that the procedures established in § 853(e)(1)(A) for granting a restraining order violate due process. *United States v. Crozier,* 777 F.2d 1376, 1383–84 (9th Cir.1985); *accord Harvey,* 814 F.2d at 928; *United States v. Lewis,* 759 F.2d 1316, 1324–25 (8th Cir.), *cert. denied,* 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985); *but see United States v. Draine,* 637 F.Supp. 482, 485–86 (S.D.Ala.1986). However, we had no occasion in *United States v. $39,000 in Canadian Currency* to decide this question. 801 F.2d at 1218–19 n. 6.

In this case, the district court noted that "[t]he procedural provisions of the statute ... are not at issue here and therefore are not considered by the court." 654 F.Supp. at 1546 n. 5. We agree. Therefore, again we have no occasion to decide whether the statutory procedures for granting an ex parte restraining order comply with due process.

examine the legislative history surrounding its enactment. We may not use the legislative history to *create* an ambiguity, however, for the words of the statute are usually the best indication of congressional intent. *See Turkette,* 452 U.S. at 593, 101 S.Ct. 2533–34. If the language of the act is unambiguous, only a " 'clearly expressed legislative intent to the contrary' " will lead to a different result. *Id.* at 580, 101 S.Ct. at 2527 (quoting *Consumer Product Safety Comm. v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056 (1980)); *see also Russello,* 464 U.S. at 20, 104 S.Ct. at 299.

We are also mindful of the consequences of holding an act of Congress unconstitutional. "Striking down a law approved by the democratically elected representatives of the people is no minor matter." *Edwards v. Aguillard,* —— U.S. ——, 107 S.Ct. 2573, 2600, 96 L.Ed.2d 510 (1987) (Scalia, J., dissenting). Therefore, if there are "two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act." *Id.* (quoting *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30, 57 S.Ct. 615, 621, 81 L.Ed. 893 (1937)). Several district courts have relied on this principle in concluding that the criminal forfeiture provisions of the 1984 act must be read to exempt assets paid to attorneys. *See Truglio,* 660 F.Supp. at 105; *Ianniello,* 644 F.Supp. at 456; *but see Harvey,* 814 F.2d at 917–18. There must, however, be more than one plausible reading of the statute for this principle to apply. *Harvey,* 814 F.2d at 917–18.

### A.

Two provisions in the 1984 amendments determine whether property transferred from a defendant to a third party is subject to forfeiture. The statute first describes what property is subject to criminal forfeiture:

> Any person convicted of [a federal controlled substance felony] shall forfeit to the United States, irrespective of any provision of State law—

> (1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation;

> (2) any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation; and

> (3) in the case of a person convicted of engaging in a continuing criminal enterprise in violation of section 848 of this title, the person shall forfeit, in addition to any property described in paragraph (1) or (2), any of his interest in, claims against, and property or contractual rights affording a source of control over, the continuing criminal enterprise.

21 U.S.C. § 853(a). In addition, Congress stated that "[t]he provision of this section shall be liberally construed to effectuate its remedial purposes," 21 U.S.C. § 853(o). This is the only such instruction in a substantive federal criminal law. *Russello,* 464 U.S. at 27, 104 S.Ct. at 302–303.

The language of section 853 is clear. Assets subject to forfeiture include "any property" obtained as a result of the crime, "any of the person's property" used to commit the crime, and "any of his interest in" a continuing criminal enterprise. The only limitations on what property can be forfeited relate to the nexus with the illegal activity. How a defendant intends to use property that would otherwise be forfeited is irrelevant. Property is not exempted because a defendant wants to use it to pay an attorney any more than property is exempted because a defendant wants to purchase a house or employ a financial advisor. As the Fourth Circuit said in *Harvey,* "Property marked for or paid as attorney fees is necessarily included within that defined as subject to forfeiture [in the statute] for the simple reason that those provisions define forfeitable property without regard to its intended or actual use, whether for payment to attorneys or for other uses." 814 F.2d at 914. That attorneys' fees are not mentioned in the statute does not mean that the language is ambiguous; rather, it suggests that attorneys' fees

were not meant to be treated differently than any other assets.

The statute further provides that a third party who obtains forfeitable property after the criminal act can defeat the claim of the government only if "the transferee establishes ... that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture." 21 U.S.C. § 853(c). This language is also clear. It defines the two conditions a third party transferee must satisfy in order to retain property that would be forfeited if it remained in the possession of the defendant.[5] Here, as before, "attorney fees are not expressly singled out for special treatment; they are not mentioned." *Harvey*, 814 F.2d at 914. Several courts that have read the statute to exempt attorneys' fees have nonetheless recognized that the language of this third party transfer provision does not include any special treatment for payments made to attorneys. *See Estevez*, 645 F.Supp. at 870; *Ianniello*, 644 F.Supp. at 455.

We therefore agree with the district court that the plain language of section 853(a) includes assets that are paid to attorneys within the definition of property subject to forfeiture and that the plain language of section 853(c) imposes the same conditions on attorneys as it does on any other third party who seeks to defeat a forfeiture claim. As the Fourth Circuit observed, some courts that have found the statute ambiguous actually look at what the statute does *not* say. *Harvey*, 814 F.2d at 916. Other courts cannot believe that Congress intended to require the forfeiture of attorneys' fees. *See Estevez*, 645 F.Supp. at 872; *Badalamenti*, 614 F.Supp. at 196–98. But the " 'fact that [a law] has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.' " *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499, 105 S.Ct. 3275, 3287, 87 L.Ed.2d 346 (1985) (*quoting Haroco, Inc. v. American Nat'l Bank & Trust Co.*, 747 F.2d 384, 398 (7th Cir.1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985)).

### B.

It is the legislative history of the 1984 act, not its plain language, that is ambiguous on the question of payments made to an attorney. The courts and commentators that suggest Congress did not intend to subject attorneys' fees to forfeiture rely upon three statements in the Senate and House reports and on an interpretation of the general purposes of the act. Our examination of the legislative history of the amendment of the criminal forfeiture provisions persuades us that Congress did not specifically decide whether attorneys' fees should be forfeited but that such forfeiture is not inconsistent with the purposes of the amendments.

Two statements in the Senate report have been cited as evidence that Congress intended to limit the forfeiture provisions to sham transactions. First, the Senate report contains a footnote that reads: "The provision [18 U.S.C. § 1963(m)] should be construed to deny relief to third parties acting as nominees of the defendant or who have knowingly engaged in sham or fraudulent transactions. The standard for relief reflects the principles concerning voiding of transfers set out in 18 U.S.C. 1963(c), as amended by the bill." S.Rep. at 209 n. 47, U.S.Code Cong. & Admin.News 1984, p. 3392 n. 47. Second, the Senate report discussion of the third party transfer provision says, "The purpose of this provision is to permit the voiding of certain pre-conviction transfers and so close a potential loophole in current law whereby the criminal forfeiture sanction could be avoided by transfers that were not 'arms' length' transactions." S.Rep. at 200–01, U.S.Code Cong. & Admin.News 1984, pp. 3383–3384.

---

5. An attorney representing a defendant is unlikely to qualify for an exemption from forfeiture because he or she is not "reasonably without cause to believe that the property was subject to forfeiture." 21 U.S.C. § 853(c). What property is subject to forfeiture is specified in the indictment, so an attorney is uniquely likely to know that there is a claim pending against the defendant's property. *Accord Badalamenti*, 614 F.Supp. at 196.

Several courts have cited the first passage—footnote 47 in the Senate report—in limiting the operation of the third party forfeiture provision to sham or fraudulent transactions. *Thier,* 801 F.2d at 1471; *Ianniello,* 644 F.Supp. at 455–56; *Rogers,* 602 F.Supp. at 1347. Also, the passage of the Senate report evincing a purpose of voiding transfers that were not at "arms' length" is relied upon to support the view that Congress's exclusive concern was sham transactions. *Figueroa,* 645 F.Supp. at 456–57; *Rogers,* 602 F.Supp. at 1347. Thus, because a lawyer representing a criminal defendant is not engaged in a sham transaction, these courts have held that assets paid to an attorney cannot be forfeited.

There are many difficulties with this position. Most significantly, as noted by the court in *Harvey,* limiting forfeiture to third parties engaged in sham transactions ignores the contrary words of § 853(c) requiring the forfeiture of assets held by all third parties unless the transferee was "reasonably without cause" at the time of the purchase to believe that the property was subject to forfeiture. 814 F.2d at 916. A third party can obtain assets through a non-sham transaction but with the knowledge that the assets are subject to forfeiture. The statute as written by Congress establishes that third party transfers are subject to forfeiture on the basis of the purchaser's knowledge of the possibility of forfeiture, not on the basis of whether the transaction was fraudulent.

An exclusive focus on sham transactions is misplaced. In reaching its conclusion that third party forfeiture should be limited to such transactions, the court in *Rogers* quotes footnote 47 as follows: "The provision should be construed to deny relief [*only*] to third parties acting as nominees of the defendant or who have knowingly engaged in sham or fraudulent transactions." 602 F.Supp. at 1347 (emphasis added). The word "only," however, does not appear in the Senate report. Its inclusion "subtly transformed the Committee's observation that relief should be *denied* to third parties who receive forfeitable assets through a sham transaction into a directive that relief should be *granted* in all other circumstances." Brickey, 72 Va.L.Rev. at 500 (emphasis original). Moreover, even if Congress was primarily interested in sham transactions, we need not conclude that Congress was interested only in such transactions. "A legislative intent more restrictive than that reflected in the literal sweep of a statute cannot be inferred from the fact alone that the statute as plainly written sweeps more broadly than the central concern that prompted its enactment." *Harvey,* 814 F.2d at 916.

The general purpose of the 1984 amendments was to increase the effectiveness of the criminal forfeiture provisions in attacking the economic bases of drug traffickers and organized crime. S.Rep. at 191; H.Rep. No. 98–845, 98th Cong., 2d Sess. 1 (1984) [hereinafter H.Rep.] Congress was concerned that illegally obtained property had been protected from forfeiture in those cases in which forfeiture claims were asserted. The Senate committee wrote:

> The problem of pre-conviction dispositions of property subject to criminal forfeiture is further complicated by the question of whether, *simply by transferring an asset to a third party,* a defendant may shield it from forfeiture.
>
> . . . .
>
> In sum, present criminal forfeiture statutes do not adequately address the serious problem of a defendant's pretrial disposition of his assets. Changes are necessary both to preserve the availability of a defendant's assets for criminal forfeiture, and, *in those cases in which he does transfer, deplete, or conceal his property,* to assure that he cannot as a result avoid the economic impact of forfeiture.

S.Rep. at 196 (emphasis added). Thus, Congress was concerned with *all* of the methods by which a defendant could shield illegally obtained property from forfeiture. The broad congressional concern with the depletion of any property subject to forfeiture was not limited by willingness to allow a defendant to use that property for certain purposes, such as paying an attorney. This is especially significant in light of the

express command in section 853, mentioned above, that the act should be liberally construed so as to serve its remedial purposes. Therefore, the forfeiture of property paid to an attorney who does not satisfy the "reasonably without cause to believe" exception is consistent with the congressional intent to eliminate all but a narrow class of third party transfers.

The district court held that payments to attorneys are not exempt from forfeiture within the unambiguous language of the statute. However, the court also suggested that such an exemption is consistent with the desire of Congress to eliminate the economic base of drug dealers and organized crime because permitting a defendant to pay an attorney does not create an incentive to commit crime. 654 F.Supp. at 1558; *accord Thier,* 801 F.2d at 1474–75. We have no warrant to attempt the probably impossible task of exempting those uses of illegally obtained property that do not provide an incentive to crime and permitting the forfeiture of property used in a manner that does provide such an incentive. Moreover, the suggestion that forfeiture is not necessary because the defendant no longer has the property would apply equally to all transfers of property to a third party. Just as a defendant can no longer use property transferred to an attorney, a defendant cannot use property transferred to an accountant or a mechanic.

In fact, an exemption for attorneys' fees undermines the congressional goal of increasing the forfeiture of criminally obtained assets. If the defendant is convicted, an effect of such an exemption is that the defendant has been allowed to purchase a range of defense services that would have been unavailable if the defendant had only used legally obtained assets. An exemption for attorneys' fees means that a convicted defendant has been allowed to obtain a benefit from the profits of his or her crime. As the Seventh Circuit said:

> Every dollar that the racketeer derives from illicit activities and then spends on such items as food, entertainment, college tuition, and charity, is a dollar that should not have been available for him to spend for those purposes. In order to truly separate the racketeer from his dishonest gains, therefore, the statute requires him to forfeit to the United States the total amount of the proceeds of his racketeering activity....

*United States v. Ginsburg,* 773 F.2d 798, 802 (7th Cir.1985) (en banc), *cert. denied,* 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986). Allowing a defendant to use forfeitable assets for any purpose flouts the congressional directive that crime should not pay.

Of course, even if the general congressional purpose in amending the forfeiture provisions would justify the forfeiture of attorneys' fees, a clear and specific congressional intent to exclude attorneys' fees would prevail. The only enigmatic indication that Congress, or at least the House, was aware of this issue appears in a footnote in the House report:

> Nothing in this section [authorizing restraining orders] is intended to interfere with a person's Sixth Amendment right to counsel. The Committee, therefore, does not resolve the conflict in District Court opinions on the use of restraining orders that impinge on a person's right to retain counsel in a criminal case. Compare *United States v. Meinster,* [475 F.Supp. 1093 (S.D.Fla.1979] (court approved post-indictment transfer of assets to defendant's retained counsel), [*aff'd,* *United States v. Phillips,* 664 F.2d 971 (5th Cir.1981), *cert. denied,* 457 U.S. 1136 [102 S.Ct. 2965, 73 L.Ed.2d 1354] (1982) ]; *United States v. Mandel,* 408 F.Supp. 679, 682–84 (D.Md.1976) (court denies order restraining transfer of assets), *With United States v. Bello,* 470 F.Supp. 723 (S.D.Cal.1979) (court approves restraining order because appointed counsel is available).

H.Rep. at 19 n. 1.

A number of contrasting meanings have been assigned to this passage. Some say that it shows that "Congress has recognized the need to insure the right to counsel in the context of third-party forfeiture of assets." *Rogers,* 602 F.Supp. at 1347; *see also Ianniello,* 644 F.Supp. at 456. Others suggest that this footnote shows

Congress intended to allow the forfeiture of attorneys' fees to the extent it is constitutionally permissible. Note, 86 Colum.L. Rev. at 1027. We think it is most likely that Congress, having noted the problem, did not imply its endorsement or disapproval of either result and simply left the question for the courts. *Accord Payden,* 605 F.Supp. at 850 n. 14; *see also* Brickey, 72 Va.L.Rev. at 501–02.[6]

A final, telling indication that Congress did not intend to exempt attorneys' fees from the criminal forfeiture amendments is that Congress has specifically exempted attorneys' fees from forfeiture in another context. A 1984 federal law provides for the forfeiture of the profits gained by a convicted criminal's sale of the media rights for a depiction of the crime. 18 U.S.C. § 3671(a). The statute explicitly exempts up to twenty percent of the profits from forfeiture to allow the defendant to pay for legal representation "in matters arising from the offense." 18 U.S.C. § 3671(c)(1)(B)(ii). No such exemption is contained in the drug felony or RICO forfeiture provisions.

### C.

We hold that the unambiguous language of section 853 does not exempt attorneys' fees from forfeiture. We also hold that the legislative history of the 1984 amendments shows Congress did not specifically decide that attorney's fees should be exempt from forfeiture, but that the broad purposes of the amendments support forfeiture in as many instances as permissible. We therefore affirm the holding of the district court on this issue.

We are aware of the underlying constitutional concerns that have led other courts to exempt attorneys' fees from forfeiture. We agree with Chief Judge Jenkins, however, that "[t]he only issue Congress left to the courts was whether or not the provision, as written to encompass attorneys' fees, is constitutional. The question is not what Congress intended to say, but rather is the statute, as applied to attorneys' fees, constitutional." 654 F.Supp. at 1556. We now proceed to answer that question directly.

## V. THE RIGHT TO CHOICE OF COUNSEL AND THE 1984 ACT

The sixth amendment provides, "In all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for defense." [7] The appellees contend, and the district court held, that the

---

**6.** The district court said that the hearings on the amendments to the criminal forfeiture provisions demonstrate that Congress considered the impact of forfeiture on the right to counsel but decided not to create a special exemption for attorney's fees. 654 F.Supp. at 1556. The court, however, did not cite any specific discussions in the hearings. Our review of the hearings and the rest of the legislative history has produced only a few oblique references to payments of attorneys. The House report and the Senate hearings refer to *United States v. Meinster,* 475 F.Supp. 1093 (S.D.Fla.1979), *aff'd, United States v. Phillips,* 664 F.2d 971 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, [102 S.Ct. 2965, 73 L.Ed. 2d 1354] (1982), a case in which the government sought the forfeiture of two residences with a combined value of $750,000. The judge refused to freeze the assets because of the potential interference with the defendants' right to counsel. Senate Hearings at 53. After the defense attorneys received $559,000 and the wife of one of the defendants was paid, only $16,000 was forfeited to the government. H.Rep. at 3. In another discussion during the House hearings, a defense attorney described the inability of RICO and CCE defendants to afford the expenses of defending against those charges. House Hearings at 52–62. Finally, the GAO report prepared for Congress and considered in the hearings stated that defense attorneys had been able to defeat forfeiture claims by placing a lien on the defendants property. GAO Report at 35. None of these passages indicate that Congress specifically considered whether payments made to attorneys should be subject to forfeiture.

**7.** There are several components to the sixth amendment right to counsel. First, a defendant has an absolute right to be represented by an attorney in a criminal proceeding that could result in imprisonment. *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). In such cases an attorney must be provided to a defendant who cannot afford to retain counsel. *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Second, a defendant has a right to the effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1983). Third, a defendant has a qualified right to a fair opportunity to select counsel of the defendant's choice.

application of the criminal forfeiture provisions of the 1984 amendments to assets that a defendant seeks to use to retain an attorney violates the sixth amendment right to choice of counsel. We hold that the district court misconstrued the scope and nature of that right and, as a result, the court found an infringement of the right to choice of counsel where none exists. Accordingly, we reverse.

### A.

As a preliminary matter, the government argues that we do not need to decide the constitutional question for two reasons. First, it argues that "none of the defendants in this case can claim that he was entitled to use his seized assets to exercise a right to counsel of choice since it is now an uncontrovertible fact that none of them had legitimate title to those assets." Brief of Appellant at 10. Second, the government argues that the appellees cannot claim they were denied their right to choice of counsel because "the defendants in this case in fact *were* represented by their counsel of choice." *Id.* at 11 (emphasis original).

The government's first argument fails because it does not take into account the procedural posture of the appellees' attempt to exempt attorneys' fees. The appellees raised the sixth amendment question in pretrial motions to exempt from the restraining orders assets that would be transferred to their attorneys. *At that time,* the government's title to the property identified in the indictment and in the restraining orders had not been established. The district court deferred its decision and did not rule on the motions until after trial. The court's decision correctly treated the issue in the context of a pretrial challenge to a restraining order. 654 F.Supp. at 1545. The government cannot now rely on the later conviction to transform motions properly brought before trial.

The government's second argument emphasizes that the appellees, with one exception, were represented by attorneys they had selected. *See United States v. Ray,* 731 F.2d 1361, 1366 (9th Cir.1984) (court

need not decide if restraining order violates right to choice of counsel because defendant was represented by counsel of choice). Essentially the government is arguing that the defendants in this case were not injured by the government's action. Lack of injury would deprive the defendants of standing and preclude us from reaching the merits of their claim. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

The government's argument is inextricably linked to its conception of the sixth amendment right to choice of counsel and presumes that its view of that right is correct. The government argues that a defendant should not be allowed to raise the choice of counsel claim unless the defendant can show that the government's action caused the defendant to be denied the services of a desired attorney of his or her choice. Thus, a defendant would first have to prove that he or she had no other assets available to retain an attorney. The defendant would then have to establish that the restrained assets belonged to the defendant. In effect, the defendant would have to defeat the forfeiture claim at trial. Then, and only then, would the government have us consider the defendant's claim that he or she was denied chosen counsel.

The appellees, on the other hand, assert that the right to choice of counsel is abridged if a defendant is wrongfully prohibited from using assets in his or her possession to retain an attorney. The availability of other assets and the ultimate determination of the ownership of the assets are irrelevant to the constitutional violation alleged by the appellees. Thus, the appellees and the government have fundamentally different conceptions of the scope of the right to choice of counsel.

The appellees in this case argue that the right to choice of counsel requires that attorneys' fees be exempted from forfeiture. The fact that the appellees are represented by chosen counsel is irrelevant to the constitutional violation they allege. If the appellees' conception of the right to

choice of counsel is correct, the government's actions have violated that right. In determining whether there is standing, "the court assumes *arguendo* that [appellees] [have] pleaded and could prove a violation of substantive law, and asks only whether [they] [have] alleged a concrete injury and a sufficient causal relationship between the injury and the violation." *Industrial Inv. Dev. Corp. v. Mitsui & Co.,* 671 F.2d 876, 888–89 (5th Cir.1982). Because we find that plaintiffs have alleged a "concrete injury and a sufficient causal relationship," we must decide the merits of the right to choice of counsel question presented here.

### B.

■ The appellees in this case argue that the issuance of a restraining order pursuant to 21 U.S.C. § 853(e) without exempting assets necessary to secure an attorney violates their right to choice of counsel. If the appellees never had the resources to select and retain an attorney, or if some private actor had restricted their financial ability to retain an attorney, they could not now argue that their right to choice of counsel has been abridged. Thus, the appellees necessarily contend that the *government* may not constitutionally restrict their financial ability to hire an attorney, or at least that the government has unconstitutionally restrained their assets in this case.

No one suggests that once a defendant has been convicted and assets have been forfeited to the government that the defendant has any right to use those assets for any purpose. For example, if a defendant has been convicted of a RICO violation and has forfeited all of the proceeds from that crime, and then several years later the same defendant is indicted for a federal drug felony, the defendant cannot assert a right to use the previously forfeited assets, even if the defendant will otherwise be unable to afford privately retained counsel. The reason is obvious: the government indisputably obtained title to the assets previously possessed by the defendant. The United States argues that the case we are

now reviewing is no different because the government obtained title to the assets at the time of the illegal act. In essence, the government says that *its* assets have been frozen, a claim which the defendants strenuously dispute. The fundamental question, then, is whose assets have been frozen. It is thus apparent that the relation back provision, 21 U.S.C. § 853(c), is the critical provision of the 1984 act.

Section 853(c) provides that title to property used in the commission of a drug felony vests in the United States at the time of the crime. The property itself is tainted by its involvement in criminal activity. Therefore, any subsequent transfer of the property to a third party is subject to the superior title of the government. Once the title shifts to the government, the defendant no longer has any interest in the property that can be conveyed.

The problem raised by the relation back provision is that while title shifts upon the occurrence of the illegal act, the determination that the defendant committed a crime and that the designated assets are linked to that crime is not made until after trial. The government's title is established by the judgment. *See, e.g., Thier,* 801 F.2d at 1476; *United States v. One 56–Foot Yacht Named the Tahuna,* 702 F.2d 1276, 1279 (9th Cir.1983). Thus, at the time a restraining order is sought, it is not clear who owns the property. The government, through the indictment, has established probable cause to believe that the property has been used in an illegal activity and is subject to forfeiture. The allegations, of course, have not yet been proved. Indeed, the purpose of the trial itself is to determine if a crime has been committed, and consequently, who owns the assets.

In many ways an order restraining a defendant's use of assets subject to forfeiture is similar to other claims, such as a prior mortgage, which limit a defendant's use of property in his or her possession. All are means of restricting the disposition of property pending a resolution of competing claims to title. Any third party creditor, not just the government in a forfeiture case, has an interest in how a debtor dis-

poses of property. More importantly, the government has the same interest in prohibiting a defendant from using forfeitable assets to pay an attorney as it does in prohibiting the use of those assets to pay any other third party. Or, as one court has made the point more colorfully, "In the same manner that a defendant cannot obtain a Rolls–Royce with the fruits of a crime, he cannot be permitted to obtain the services of the Rolls–Royce of attorneys from these same tainted funds." *Payden*, 605 F.Supp. at 850 n. 14.

Freezing assets that would otherwise be paid to an attorney, rather than any other third party, does pose one unique problem: a defendant is denied the opportunity to use assets in a manner that could establish that the defendant is innocent, and thus, that the assets belong to the defendant. The period immediately before and during trial is the time at which the defendant needs the use of the assets to prepare a defense to the allegations of criminal liability and criminal forfeiture. This is the only respect in which the use of assets to pay an attorney is different from the use of assets to pay any other creditor who has been, or would have been, paid from frozen assets.

The appellees argue that this difference mandates a constitutional exemption for attorneys' fees from forfeiture. They would have us hold that an order restraining the use of specified assets pending a determination of ownership, based upon a showing of probable cause to believe the government has title, denies a criminal defendant the constitutional right to retain private counsel of choice. Therefore, we must decide whether Congress may constitutionally use a relation back provision to give the government title to assets related to the offense at the time of the offense. If the government's interest is valid, we must also decide whether Congress may constitutionally authorize a restraining order procedure to protect the government's interest pending trial.

The relation back concept has longstanding application in civil forfeiture proceedings. The Supreme Court first deferred to a congressional determination that forfei-ture should take place upon the commission of an offense in 1814. *United States v. 1960 Bags of Coffee*, 12 U.S. (8 Cranch) 398, 404–05, 3 L.Ed.602 (1814). The relation back concept was well established by the end of the nineteenth century. In *United States v. Stowell*, 133 U.S. 1, 16–17, 10 S.Ct. 244, 247, 33 L.Ed. 555 (1890), the Court said:

> By the settled doctrine of this court, whenever a statute enacts that upon the commission of a certain act specific property used in or connected with that act shall be forfeited, the forfeiture takes effect immediately upon the commission of the act; the right to the property then vests in the United States, although their title is not perfected until judicial condemnation; the forfeiture constitutes a statutory transfer of the right to the United States at the time the offense is committed; and the condemnation, when obtained, relates back to that time, and avoids all intermediate sales and alienations, even to purchasers in good faith.

The legitimacy of a relation back provision vesting title in the government at the time of the offense continues to be accepted in civil forfeiture proceedings today. *See, e.g., United States v. "Monkey"*, 725 F.2d 1007, 1012 (5th Cir.1984); *United States v. $84,000 U.S. Currency*, 717 F.2d 1090, 1102 (7th Cir.1983), *cert. denied*, 469 U.S. 836, 105 S.Ct. 131, 83 L.Ed.2d 71 (1984); *Simons v. United States*, 541 F.2d 1351, 1352 (9th Cir.1976); *cf. United States v. Wingfield*, 822 F.2d 1466, 1475 (10th Cir. 1987) (referring to "the use of the doctrine of relation back as it is explained in *United States v. Stowell*").

The Seventh Circuit has upheld the application of the relation back doctrine in criminal forfeiture cases. *Ginsburg*, 773 F.2d at 802; *see also Ramaria Familienstiftung v. United States*, 643 F.Supp. 139, 145 (S.D.Fla.1986) (applying the relation back doctrine in a criminal forfeiture case to defeat a transfer of assets after the crime). We agree that the relation back concept may be extended to criminal forfeiture proceedings. The theory of the concept does not demand its limitation to civil proceedings. The principle underlying a

relation back provision is that the property itself is guilty of wrongdoing and is therefore "tainted" at the time of the offense. *See United States v. United States Coin and Currency*, 401 U.S. 715, 719, 91 S.Ct. 1041, 1043–44, 28 L.Ed.2d 434 (1971); *see also Calero–Toledo*, 416 U.S. at 680–81, 94 S.Ct. at 2090–91. The government's interest in the tainted property arises from the government's power to regulate illegal activities. More specifically, the government has an interest in regulating the means and fruits of illegal activity. Laws defining contraband are one example of congressional power to create a governmental interest in property involved in criminal activity. *See* 49 U.S.C. § 781(b) (drugs, firearms, counterfeit coins, and cigarettes); 18 U.S.C. § 2341(2) (cigarettes); 15 U.S.C. § 715a(1) (oil). So viewed, the relation back doctrine operates in the same manner as any other allegation in an indictment. Just as the government must prove that the defendant committed the acts charged in order to establish the guilt of the defendant, the government must prove the guilt of the defendant and the nexus between the illegal acts and the property in order to establish the "guilt" of the property and thus obtain forfeiture.

The appellees argue, and the district court agreed, that the application of the relation back provision in the criminal forfeiture context violates a defendant's presumption of innocence. 654 F.Supp. at 1559; *see also Thier*, 801 F.2d at 1476; *Badalamenti*, 614 F.Supp. at 198. The relation back provision does not allow a court to presume guilt.[8] The government must prove a forfeiture allegation in an indictment in the same manner that it must prove any other allegation in an indictment.

Whether or not the property will be forfeited is not determined until trial. Additionally, the presumption of innocence has no application to the determination of the rights of a defendant before trial. *Bell v. Wolfish*, 441 U.S. 520, 532–33, 99 S.Ct. 1861, 1870–71, 60 L.Ed.2d 441 (1979). The doctrine serves only to allocate the burden of proof at trial and to admonish the jury to decide guilt or innocence solely on the basis of the evidence produced at trial. *Id.* at 533, 99 S.Ct. at 1870–71.

Congress, then, has the constitutional authority to use a relation back provision to create a governmental interest in property involved in criminal activity. The provision allowing a restraining order to be issued is designed to protect the government's interest by preserving the property in the event that forfeiture is eventually required. Such an order would implicate the right to choice of counsel only if it is improper to deny a defendant an opportunity to use any assets in his or her possession. The district court and other courts that have required an exemption for assets used to pay an attorney have thought it significant that the defendant could use the frozen property but for the action of the government. 654 F.Supp. at 1559; *see also Ianniello*, 644 F.Supp. at 458. This is undeniably true, but it is significant only if the governmental action is improper. We think it is not improper.

The government may act in a manner that adversely affects a criminal defendant before trial when it is necessary to protect an important public interest. A recent illustration of congressional authority to act in this manner is the Supreme Court's decision in *United States v. Salerno*, —— U.S.

8. The 1984 amendments do create a rebuttable presumption that property belonging to a convicted defendant is subject to forfeiture if it was acquired during or at a reasonable time after the criminal offense and there is no other likely source from which the property was obtained. 21 U.S.C. § 853(d). This presumption applies only to a *post*-conviction determination of *which* assets belonging to a defendant are forfeitable. Although the defendants in this case were eventually convicted, the issue they raise concerns the pre-conviction restraint of their assets. Their claim goes not to *which* of their assets were forfeitable but to whether a pre-conviction restraint may be placed on *any* of their assets which they needed to pay an attorney. The presumption in section 853(d) is therefore not an issue in this case, and we express no view on its constitutionality. *Compare* S.Rep. at 212 (presumption is constitutional) *with* Markus, *Procedural Implications of Forfeiture under RICO, the CCE, and the Comprehensive Forfeiture Act of 1984: Reforming the Trial Structure*, 59 Temp.L.Q. 1097, 1120–22 (1986) (presumption is unconstitutional).

——, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). In *Salerno*, the Court upheld the facial constitutionality of a federal statute permitting pretrial detention of a defendant in certain instances. The Court stressed that pretrial detention is a regulatory measure necessary to protect the public's interests in community safety and in preventing crime. *Id.* 107 S.Ct. at 2102–03. Those interests would be threatened if no action could be taken prior to trial. The Court thus allowed the imprisonment of a limited class of defendants prior to trial.

Another example of congressional authority to act in a manner adversely affecting a criminal defendant before trial is the requirement that a defendant post bail. Any assets that are used to post bail are no longer available to retain an attorney. Nevertheless, a federal defendant may be required to "execute a bail bond with solvent sureties in such amount as is reasonably necessary to assure the appearance" of the defendant in court. 18 U.S.C. § 3142(c)(1)(B)(xii). Bail thus serves the public's interest in securing a defendant's presence in court.

Similarly, an order restraining a defendant's use of potentially forfeitable property is a regulatory measure necessary to protect an important public interest. As Justice Brennan has said, a restraint on property that is subject to forfeiture is an appropriate means of "fostering the public interest in preventing continued illicit use of the property and in enforcing criminal sanctions." *Calero–Toledo,* 416 U.S. at 679, 94 S.Ct. at 2089–2090; *see also Barr v. United States Dep't of Justice,* 819 F.2d 25, 28 (2d Cir.1987) (government may freeze allegedly fraudulently obtained assets of a defendant indicted for conspiracy, fraud, and grand larceny). Further, Congress expressly intended to address the problem of a defendant's pretrial disposition of assets that the government otherwise would have obtained after trial. S.Rep. at 195. "The sole purpose of the bill's restraining order provision ... is to preserve the status quo, *i.e.,* to assure the

availability of the property pending disposition of the criminal case." *Id.* at 204. Without a restraining order, the government is powerless if a defendant "dissipates his profits on wine, women, and song before his conviction and having dissipated his interest in the profits would have nothing left to forfeit." *United States v. Alexander,* 741 F.2d 962, 968 (7th Cir.1984), *overruled, Ginsburg,* 773 F.2d 798.

It is possible, of course, that a defendant who is ultimately found innocent will have been denied an opportunity to use property that was not involved in criminal activity, just as it is possible that a defendant who is ultimately found innocent will have been subjected to pretrial detention. If attorneys' fees are exempted, however, it is also possible that a defendant who is ultimately found guilty will have been allowed to use the fruits of the crime to secure an attorney. The question we must decide is not which of these results is least desirable. Instead, we must determine whether Congress's decision that a defendant may be denied the opportunity to use allegedly illegally obtained assets to retain counsel is unconstitutional.

### C.

Having held that the relation back scheme is valid, we turn to the more specific question of whether an exemption for attorneys' fees is mandated by the right to counsel. "It is hardly necessary to say that the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell v. Alabama,* 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932). The right to counsel of choice has been described as an "essential component" of the sixth amendment right to counsel. *Linton v. Perini,* 656 F.2d 207, 209 (6th Cir.1981), *cert. denied,* 454 U.S. 1162, 102 S.Ct. 1036, 71 L.Ed.2d 318 (1982). The precise contours of this right, however, have not yet been determined. Indeed, the Supreme Court has rarely spoken about the right to choice of counsel in criminal proceedings.[9]

---

**9.** The Supreme Court has never decided a case squarely on the basis of the right to choice of

counsel. The opinions that have discussed the importance of a defendant's selection of an at-

Therefore, we must analyze the nature and scope of the right to choice of counsel in light of the stated purposes served by the right and the lower court decisions construing it in specific cases.

A defendant's right to choose an attorney is a corollary of the right to decide what type of defense the accused will present. *Wilson v. Mintzes,* 761 F.2d 275, 279 n. 5 (6th Cir.1985); *United States v. Laura,* 607 F.2d 52, 56 (3d Cir.1979). Indeed, it has been said that "the most important decision a defendant makes in shaping his defense is his selection of an attorney." *Laura,* 607 F.2d at 56. A defendant learns about the charges against him, the weaknesses of the government's case, and possible strategies through an attorney. *Id.* A defendant also allocates authority to make important decisions, some affecting constitutional rights, to an attorney. *Id.; see also Morris v. Slappy,* 461 U.S. 1, 21, 103 S.Ct. 1610, 1621 (1983) (Brennan, J., dissenting).

A defendant, then, must have confidence in the attorney who will represent him or her. For "the basic trust between counsel and client . . . is a cornerstone of the adversary system." *Linton,* 656 F.2d at 209; *but see Morris,* 461 U.S. at 13–14, 103 S.Ct. at 1617–18 (the sixth amendment does not guarantee a "meaningful attorney-client relationship"). If all attorneys were the same, the choice of an attorney would be of no moment. However, "[a]ttorneys are not fungible." *Laura,* 607 F.2d at 56. Attorneys are different, and their differ-

ences can influence the defense presented by a defendant. Therefore, a defendant is afforded an opportunity to select an attorney.

But the right to choice of counsel is not absolute. *See, e.g., United States v. Padilla,* 819 F.2d 952, 956 (10th Cir.1987); *United States v. Gipson,* 693 F.2d 109, 111 (10th Cir.1982), *cert. denied,* 459 U.S. 1216, 103 S.Ct. 1218, 75 L.Ed.2d 455 (1983). A court may restrict a defendant's choice when allowing the defendant to be represented by a particular attorney would adversely affect an important public interest. *United States v. Phillips,* 699 F.2d 798, 801–02 (6th Cir.1983). A court may not, however, "arbitrarily refuse to allow the defendant to retain the lawyer of his choice." *Ford v. Israel,* 701 F.2d 689, 692 (7th Cir.), *cert. denied,* 464 U.S. 832, 104 S.Ct. 114, 78 L.Ed.2d 114 (1983); *see also, e.g., United States v. Rankin,* 779 F.2d 956, 958 (3d Cir.1986) (choice may not be "hindered unnecessarily"); *Birt v. Montgomery,* 725 F.2d 587, 592 (11th Cir.) (en banc) (improper if "unreasonably denies" choice), *cert. denied,* 469 U.S. 874, 105 S.Ct. 232, 83 L.Ed.2d 161 (1984); *Linton,* 656 F.2d at 209 (may not "arbitrarily and unreasonably interfere" with choice).

Several limitations on the right to select an attorney illustrate that the right to choice of counsel is not coextensive with the right to some counsel. A defendant's choice for representation can be denied if that person is not admitted to practice law

torney have been decided on grounds other than a constitutional right to choice of counsel. *See Powell,* 287 U.S. at 71, 53 S.Ct. at 65 (due process violated when indigent defendants in a capital case were denied effective assistance of counsel); *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942) (sixth amendment right to effective assistance of counsel violated by appointment of an attorney with a conflict of interest); *Chandler v. Fretag,* 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4 (1954) (due process violated by failure to provide reasonable opportunity to obtain counsel); *Crooker v. California,* 357 U.S. 433, 440–41, 78 S.Ct. 1287, 1292, 2 L.Ed.2d 1448 (1958) (voluntary confession in the absence of an attorney does not violate due process), *overruled, Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966);

*Faretta v. California,* 422 U.S. 806, 835–38, 95 S.Ct. 2525, 2541–43, 45 L.Ed.2d 562 (1975) (defendant has constitutional right to conduct his own defense); *Flanagan v. United States,* 465 U.S. 259, 270, 104 S.Ct. 1051, 1057, 79 L.Ed.2d 288 (1984) (pretrial disqualification of defense counsel not immediately appealable). Justice Brennan's dissenting opinion in *Morris v. Slappy,* 461 U.S. 1, 19–26, 103 S.Ct. 1610, 1620–24, 75 L.Ed.2d 610 (1983), contains the most extensive discussion of the right to choice of counsel. The Court in *Morris,* however, rejected Justice Brennan's contention that an indigent defendant has a right to maintain a continuing relationship with a particular attorney. *Compare id.* at 13–15, 103 S.Ct. at 1617–18 (opinion of O'Connor, J.) *with id.,* 103 S.Ct. at 25 (Brennan, J., dissenting).

in the relevant jurisdiction.[10] A defendant does not have a constitutionally protected right to be represented by a person who is not admitted to the bar. *United States v. Tedder,* 787 F.2d 540 (10th Cir.1986); *United States v. Gigax,* 605 F.2d 507 (10th Cir.1979); *United States v. Afflerbach,* 547 F.2d 522 (10th Cir.1976), *cert. denied,* 429 U.S. 1098, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977). Nor may a defendant insist on being represented by an attorney who has been disbarred. *United States v. Grismore,* 546 F.2d 844 (10th Cir.1976). Also, a court may properly deny a defendant's choice of counsel if that attorney is licensed to practice only in a different state. *Williams v. Nix,* 751 F.2d 956, 959–60 (8th Cir.), *cert. denied,* 471 U.S. 1138, 105 S.Ct. 268, 86 L.Ed.2d 699 (1985); *Ford,* 701 F.2d at 692–93; *but see United States v. Panzardi Alvarez,* 816 F.2d 813, 815–18 (1st Cir.1987) (local rule limiting out-of-state attorneys to one *pro hac vice* appearance annually fails to advance interest in regulating conduct of attorneys). In these instances the government's interests in the fair and efficient administration of justice, in obtaining relevant evidence, and in assuring the ethical conduct of the bar have justified a denial of a defendant's representative of choice.

Another situation in which a defendant's choice of counsel can be denied occurs when the preferred attorney cannot ethically represent the defendant in a specific case. If there is a conflict of interest between the attorney chosen by the defendant and someone involved in the trial, the attorney usually may be excluded unless the likelihood and severity of the conflict are minimal compared to the defendant's interest in obtaining counsel of choice. *See United States v. Ditommaso,* 817 F.2d 201, 219–20 (2d Cir.1987) (attorney disqualified because he had previously represented a codefendant); *United States v. Wheat,* 813 F.2d 1399, 1401 (9th Cir.) (request for substitution denied because of attorney's representation of codefendants), *cert. granted,*

— U.S. ——, 108 S.Ct. 66, 98 L.Ed.2d 30 (1987); *United States v. James,* 708 F.2d 40 (2d Cir.1983) (attorney disqualified because of his prior representation of a witness); *Phillips,* 699 F.2d 798 (attorney disqualified because he had represented the person defendant named as his supplier in a drug prosecution); *Davis v. Stamler,* 650 F.2d 477 (3d Cir.1981) (attorney disqualified because he had represented the company whose assets defendant was being tried for converting); *United States v. Provenzano,* 620 F.2d 985, 1004–05 (3d Cir.) (attorney disqualified because of his prior representation of government's chief witness), *cert. denied,* 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980); *United States v. Kitchin,* 592 F.2d 900 (5th Cir.) (attorney disqualified because law firm associate had previously worked with the prosecution in the case), *cert. denied,* 444 U.S. 843, 100 S.Ct. 86, 62 L.Ed.2d 56 (1979); *but see United States v. Washington,* 797 F.2d 1461, 1464–67 (9th Cir.1986) (error to disqualify attorney who had previously worked with Justice Department Strike Force simply because of an appearance of impropriety); *United States v. Cunningham,* 672 F.2d 1064 (2d Cir.1982) (error to disqualify one attorney because he had previously represented a witness, but partial disqualification of a second attorney for similar reasons permissible). A defendant's choice of counsel has also been denied when the preferred attorney has been implicated in the crime, *United States v. Garrett,* 727 F.2d 1003, 1007–08 (11th Cir.1984), *aff'd,* 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), or when the attorney was scheduled to be called as a witness, *In re Grand Jury Subpoena Served Upon Doe,* 781 F.2d 238 (2d Cir.1985) (en banc), *cert. denied,* 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 914 (1986). The government's interests in avoiding unethical practices and in maintaining the integrity and the appearance of integrity of the judiciary have justified the denial of a defendant's selected counsel.

---

**10.** An accused has the right to conduct his or her own defense even if the defendant is not a licensed attorney. *Faretta v. California,* 422 U.S. 806, 835–38, 95 S.Ct. 2525, 2541–43, 45 L.Ed.2d 562 (1975). This right does not allow a defendant to select some other person who is not a licensed attorney to represent the defendant at trial.

A defendant's choice of counsel may be denied by a court's refusal to grant a continuance necessary to allow the chosen attorney to participate in the case. This issue has arisen when a defendant had not obtained an attorney by the time of trial, *United States v. Kelm*, 827 F.2d 1319, 1320–21 (9th Cir.1987); *United States v. Leavitt*, 608 F.2d 1290, 1293–94 (9th Cir. 1979); when a chosen attorney claimed that he or she had inadequate time to prepare for trial, *Birt*, 725 F.2d at 591–92; *United States v. LaMonte*, 684 F.2d 672 (10th Cir. 1982); *Linton*, 656 F.2d at 208; when a chosen attorney was unavailable because of illness, *Giacalone v. Lucas*, 445 F.2d 1238, 1241–42 (6th Cir.1971), *cert. denied*, 405 U.S. 922, 92 S.Ct. 960, 30 L.Ed.2d 793 (1972); or a scheduling conflict, *Sampley v. Attorney General of North Carolina*, 786 F.2d 610, 611–12 (4th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 3305, 92 L.Ed.2d 719 (1986); *Rankin*, 779 F.2d at 956–58; when counsel withdrew, *Padilla*, 819 F.2d at 954–55; *United States v. Burton*, 584 F.2d 485, 488 (D.C.Cir.1978), *cert. denied*, 439 U.S. 1069, 99 S.Ct. 837, 59 L.Ed.2d 34 (1979); or when a defendant sought to obtain a new attorney immediately before, *Urquhart v. Lockhart*, 726 F.2d 1316, 1319 (8th Cir.1984), or during trial, *United States v. Lowe*, 569 F.2d 1113, 1116 (10th Cir.), *cert. denied*, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978). In such instances, the court must balance a variety of factors, including the government's interest in the efficient administration of the trial and the defendant's interest in preserving chosen counsel, in deciding whether to grant a continuance. *See, e.g., Kelm*, 827 F.2d at 1322 n. 2 (listing five factors); *Burton*, 584 F.2d at 490–91 (listing eight factors). The trial court is afforded broad discretion in deciding whether to grant a continuance. *Morris*, 461 U.S. at 11–12, 103 S.Ct. at 1616–17.

Finally, and of special importance in this case, a defendant's right to choice of counsel is limited by the financial ability of the defendant to retain a desired attorney. This proposition is so self-evident that most courts state it only in passing, as the court did in *Burton*: "An accused *who is finan-cially able* to retain counsel must not be deprived of the opportunity to do so." 584 F.2d at 489 (emphasis added); *see also, e.g., Wheat*, 813 F.2d at 1401; *Wilson*, 761 F.2d at 280; *Urquhart*, 726 F.2d at 1319. A defendant is not denied the right to choice of counsel if he or she is unable to afford the best attorney and must settle for some other attorney. Nor is an indigent defendant denied the right to choice of counsel because he or she is unable to privately retain any attorney at all. An indigent defendant must be provided with appointed counsel at state expense. But an indigent defendant does not have a right to choose appointed counsel. *See, e.g., United States v. Allen*, 789 F.2d 90, 92–93 (1st Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 164, 93 L.Ed.2d 103 (1986); *United States v. Mitchell*, 788 F.2d 1232, 1236 (7th Cir.1986); *Williams*, 751 F.2d at 959–60; *see also Morris*, 461 U.S. at 23 n. 5, 103 S.Ct. at 1622 (Brennan, J., dissenting). In fact, a court may refuse to appoint the counsel of the defendant's choice even if that attorney is willing to represent the defendant. *United States v. Ely*, 719 F.2d 902, 904–05 (7th Cir.1983), *cert. denied*, 465 U.S. 1037, 104 S.Ct. 1313, 79 L.Ed.2d 710 (1984). Similarly, an indigent defendant does not have a right to an attorney who shares the defendant's beliefs about the validity of the law under which the defendant is being prosecuted. *See United States v. Grosshans*, 821 F.2d 1247, 1251 (6th Cir.1987); *United States v. Udey*, 748 F.2d 1231, 1242–43 (8th Cir.1984), *cert. denied*, 472 U.S. 1017, 105 S.Ct. 3477, 87 L.Ed.2d 613 (1985); *United States v. Weninger*, 624 F.2d 163, 166–67 (10th Cir.), *cert. denied*, 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980). In short, "[t]he right to counsel of choice extends no further than the accused's own financial resources." Comment, 62 Wash.L.Rev. at 219.

Each of these examples illustrates the clear principle that as long as its action is not arbitrary, a court may restrict a defendant's choice of counsel if allowing representation by a particular attorney would adversely affect an important public interest, *Phillips*, 699 F.2d at 801–02; *Ford*, 701

F.2d at 692. We hold that allowing a defendant to use illegally obtained assets to hire an attorney would adversely affect an important public interest. There is a public interest in stripping defendants of the economic power they derive from illegal activity, and "part of that undeserved power may be the ability to command high-priced legal talent." *Caplin & Drysdale*, 837 F.2d at 649. Furthermore, the public has an interest in deterrence, and a "drug kingpin's certain knowledge that he may have at his beck and call lawyers whose fees run into hundreds of thousands of dollars may make him less apprehensive about continuing in his business." *Id.* at 649.

We further hold that a court does not act "arbitrarily" when it relies as in this case on a grand jury indictment to issue a restraining order. In *United States v. Musson*, 802 F.2d 384, 386 (10th Cir.1986), we held that there is "no fundamental defect in [a grand jury] determination which would impair its use to support [a] restraining order." We noted that an indictment in a forfeiture case contains a determination by a grand jury not only that there is probable cause for an immediate arrest but also that "the described property is subject to forfeiture." *Id.* The *Musson* case involved a due process challenge to the procedures used to obtain a restraining order, but its holding is applicable to the sixth amendment issue of arbitrariness as well. Reliance upon an indictment does not constitute the arbitrary interference with the choice of counsel which is forbidden by the sixth amendment. *But see Monsanto*, 836 F.2d at 83. We conclude that the government does not deny a defendant's right to choice of counsel when it acts pursuant to a statutory procedure to protect its interest in assets in the defendant's possession. A defendant's ability to select an attorney to prepare a defense in a criminal prosecution may be limited when the government has demonstrated that it has an interest in the assets that the defendant seeks to use. The reason that Congress may constitution-

ally do this is clear: the right to choice of counsel does not vest a defendant with an absolute right to use any assets in his or her possession to retain an attorney.

## VI. POTENTIAL CONSEQUENCES OF FORFEITURE

The appellees suggest that the practical effects of the application of criminal forfeiture to attorneys' fees necessitate the exemption of assets transferred to an attorney from forfeiture.

### A.

■ Many of the sixth amendment concerns with criminal forfeiture arise from a belief that a defendant will not be able to select an attorney, or even obtain any attorney, if the government seeks forfeiture. It is feared that attorneys will not represent a defendant if assets transferred to them as payment for representation in a drug case are subject to forfeiture. *See Ianniello*, 644 F.Supp. at 456; *Badalamenti*, 614 F.Supp. at 196. The threat of forfeiture, it is argued, rather than forfeiture itself, will dissuade attorneys from accepting a case at the outset. A defendant's choice of counsel would therefore be limited by the refusal of qualified attorneys to accept his or her case.

The refusal of otherwise interested attorneys to accept a case because of the threat of forfeiture amounts to an unconstitutional restriction on a defendant's right to counsel of choice only if the defendant has a constitutional right to use assets subject to forfeiture. We have held that a defendant has no such right. Moreover, we reject the premise that a defendant who has property restrained by the government will be unable to select and retain private counsel. Several methods by which counsel may be retained have been identified.

First, a defendant may secure an attorney with any assets in the defendant's possession that are not subject to forfeiture.[11]

---

**11.** There have been situations in which all of the property in a defendant's possession has been frozen. *See Thier*, 801 F.2d at 1465; *id.* at 1477 (Rubin, J., concurring). This should not be

surprising, for most defendants are unlikely to have segregated "good" assets from "tainted" assets. It is troubling, however, that a defendant who is "the child of 'old money,'" Krieger &

It is reasonable for an attorney to believe that if some assets are designated for forfeiture, other assets are not subject to forfeiture. The Justice Department has said that prosecutors should "assist in identifying the assets, if any, belonging to a defendant which are not subject to forfeiture." *See* Justice Department Guidelines on Forfeiture of Attorneys' Fees, 38 Crim. L.Rep. (BNA) 3001, 3008 (1985) [hereinafter Justice Dep't Guidelines]. The defendant is free to dispose of any property that is not subject to forfeiture in any way he or she desires.

A second means by which a defendant may secure counsel is by assigning the defendant's claim to the property subject to forfeiture to the attorney. Appellee Nichols relied upon this type of arrangement in securing counsel in this case. In another case, a defendant whose assets were restrained by a tax lien obtained an attorney by assigning his restrained assets to the attorney. *United States v. Marshall,* 526 F.2d 1349, 1355 (9th Cir.1976). A defendant's ability to assign his or her claim to restrained property may lead some attorneys to accept a case despite the possibility that the assigned property will be forfeited to the government. An attorney might charge a higher fee in consideration of the danger that the property will be forfeited. *See* Note, 86 Colum.L.Rev. at 1042.

Family members or friends could also provide financial assistance to a defendant in securing an attorney. The attorney for Palomino was retained by family members in this case.

Van Dusen, *The Lawyer, the Client, and the New Law,* 22 Am.Crim.L.Rev. 737, 740 (1984), or who is "of the landed gentry," *Rogers,* 602 F.Supp. at 1349, is most likely to have clearly untainted property. Nonetheless, a case in which all of a defendant's property is frozen is simply one of those instances in which there are reasonable grounds to believe that all of a defendant's property is subject to forfeiture. A defendant justifiably may be denied the right to use any property that a grand jury concludes has been involved in or derived from illegal trafficking in drugs.

The district court in this case, as well as other courts, placed the burden of showing that a defendant has untainted assets on the government. 654 F.Supp. at 1559; *see also Thier,* 801 F.2d at 1477 (Rubin, J., concurring). These

Undoubtedly some defendants will not have access to any untainted assets that could be used to retain an attorney. In such cases, an attorney may be appointed to represent a defendant who is "financially unable to obtain counsel." 18 U.S.C. § 3006A(b). Two district courts have reasoned that a defendant whose assets have been frozen is not eligible for appointed counsel. *Ianniello,* 644 F.Supp. at 457; *Badalamenti,* 614 F.Supp. at 197. We think these courts have misconstrued the scope of the statutory availability of appointed counsel.

A defendant need not be "indigent" to qualify for appointed counsel. Rather, he or she need only be "financially unable to obtain counsel." *United States v. De Hernandez,* 745 F.2d 1305, 1310 (10th Cir. 1984). Financial inability is a lesser standard than indigency. *United States v. Harris,* 707 F.2d 653, 660 (2d Cir.), *cert. denied,* 464 U.S. 997, 104 S.Ct. 495, 78 L.Ed.2d 688 (1983). A broad range of considerations is relevant to whether a defendant is financially unable to obtain counsel. *United States v. Barcelon,* 833 F.2d 894, 897 (10th Cir.1987). For example, whether or not assets are available for use by a defendant is an appropriate consideration. *Id.* at 897–98. Title to property that is subject to forfeiture is indeterminate at the time a defendant seeks to obtain counsel. Assets frozen by a restraining order therefore do not contribute to the financial ability of a defendant to obtain counsel. Accordingly, appellee Hoffman was able to obtain appointed counsel in this case. *See* 654 F.Supp. at 1552 n. 15.[12]

courts did so, however, after having concluded that a defendant must be allowed to pay an attorney with assets that are subject to forfeiture. Because we hold that attorneys' fees are not constitutionally exempted from forfeiture, it follows that once an indictment establishes probable cause to believe that specified assets may be forfeited, the government need not also identify other assets that the defendant may use to secure an attorney.

**12.** Although it did not occur in this case, we observe that commentators suggest that a defendant will not be able to obtain any attorney —privately retained or appointed—if no restraining order is issued. Note, N.Y.U.L.Rev. at 134; Note, U.Mich.J.L.Ref. at 1209. This is not

Numerous objections are raised to reliance upon appointed counsel and public defenders in criminal forfeiture cases. First, it is said that public defenders do not have the resources or the expertise necessary to adequately represent a defendant charged with a federal drug felony or a CCE or RICO violation. *See Rogers,* 602 F.Supp. at 1349; *see also* Note, 39 Stan.L. Rev. at 678–79; Comment, 62 Wash.L.Rev. at 224–25. Cases involving criminal forfeiture are especially complex, lengthy, and expensive. The district court in this case noted that not all appointed counsel have the experience to represent defendants in complex criminal forfeiture cases. 654 F.Supp. at 1559 n. 23. Furthermore, public defenders are overworked, *Rogers,* 602 F.Supp. at 1349; *see also* Note, 19 U.Mich. J.L.Ref. at 1211 n. 71, and the compensation provided appointed counsel under the Criminal Justice Act has been viewed as inadequate to persuade attorneys to take these kinds of cases, *see Estevez,* 645 F.Supp. at 871.[13] Appointed counsel is not available until a defendant has been formally charged with a crime, *see Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), so an attorney cannot be appointed during grand jury proceedings, *Rogers,* 602 F.Supp. at 1349–50. Also, it is suggested that the presence of appointed counsel in a case involving criminal forfeiture could lead some juries to presume that the defendant is guilty. Note, 39 Stan.L.Rev. at 677. Finally, it is recognized that private counsel has many more resources and much more time to prepare a defense than does a public defender or an appointed attorney. Comment, 62 Wash.L.Rev. at 225.

We cannot assume as a general matter that appointed counsel would be inade-

quate. Indeed, some appointed counsel are uniquely qualified to represent a criminal defendant because of their expertise in the area. Certainly, generalized claims of inadequacy cannot determine the scope of the sixth amendment right to counsel. It is hard to conceive of a legal system in which appointed counsel is routinely adequate in a death penalty case, but is somehow inadequate in a case involving "the career criminal millionaire who purchases cars, businesses, and real estate with cash delivered to banks in suitcases." Senate Hearings at 1 (statement of Sen. Biden). We, like Justice Stevens, will not act "so dramatically to protect the elite class of powerful individuals who will benefit" from a contrary decision. *McNally v. United States,* —— U.S. ——, 107 S.Ct. 2875, 2891, 97 L.Ed.2d 792 (1987).

Even if these arguments were correct, they would prove too much. If a defendant in a case involving criminal forfeiture cannot receive adequate representation from an appointed attorney, a defendant who has no assets, restrained or otherwise, is denied adequate representation as well. The concerns about the skills and resources of public defenders and appointed counsel apply equally to all defendants. The only distinction between a defendant who has no available assets because of a restraining order and a defendant who never had any assets is the *manner* by which the defendants became unable to pay. Ultimately, then, the arguments against appointed counsel return us to the legitimacy of the government's action in restraining property allegedly obtained through or used in criminal activity. The antipathy toward reliance on appointed counsel in criminal forfeiture cases is founded upon a belief that a defendant has a constitutional right to use

---

a problem. A defendant may have assets that are subject to forfeiture but are not formally frozen by a restraining order so that no attorney will take the case. Such a defendant might be able to retain an attorney who is willing to represent the defendant despite the risk of forfeiture. Alternatively, the indeterminate status of the potentially forfeitable assets makes such assets unavailable for the purposes of determining financial inability to retain private counsel. *See Barcelon,* 833 F.2d at 897–98.

**13.** The Criminal Justice Act imposes maximum rates for the compensation of appointed attorneys. 18 U.S.C. § 3006A(d)(1) (hourly rate); 18 U.S.C. § 3006A(d)(2) (total compensation in one case). However, the chief judge of the circuit is authorized to waive the limit on total compensation in complex cases. 18 U.S.C. § 3006A(d)(3).

potentially forfeitable assets to obtain an attorney. As we have said, there is no such right.

Those who have access to assets can retain private counsel. Those who have no access to assets must rely on appointed counsel. Therefore, the result here is like the result in any other case. There is no unconstitutional denial of the right to chosen counsel.

### B.

■ The appellees assert that the criminal forfeiture provisions violate the right to counsel and due process because they provide the government with the ability to influence a defendant's choice of counsel. The district court agreed that the application of criminal forfeiture to attorneys' fees affords the government "unseemly control over who its adversaries will be." 654 F.Supp. at 1559 n. 23; *see generally* Genego, *Prosecutorial Control Over a Defendant's Choice of Counsel*, 27 Santa Clara L.Rev. 17 (1987).

Underlying this concern is a fear that the prosecution can effectively determine who will represent a defendant. The government must decide whether it will bring a drug or RICO charge against a defendant, whether a criminal forfeiture count is included, and what property is named as subject to forfeiture. Some courts suggest that the government can exclude an especially skilled defense attorney by threatening to bring a forfeiture count that it would not include if the defendant agreed to select a less qualified attorney. *Rogers,* 602 F.Supp. at 1350; *see also* Note, 86 Colum. L.Rev. at 1049. The government could also accomplish this result by seeking to disqualify an attorney or by requesting a grand jury subpoena that would require the attorney to testify about the attorney-client relationship. Genego, 27 Santa Clara L.Rev. at 19. Alternatively, as the district court recognized, the government could

style a forfeiture allegation to include everything a defendant owns, thus making it impossible for a defendant to retain an attorney and therefore necessary to rely on appointed counsel. 654 F.Supp. at 1559 n. 23; *see also Estevez,* 645 F.Supp. at 871. Any of these results would undermine the balance necessary to the adversary system.

We will not tolerate this or any other type of prosecutorial misconduct.[14] We do not agree, however, that the possibility of abuse renders the criminal forfeiture statute unconstitutional. *See Rogers,* 602 F.Supp. at 1350. "The remedy for prosecutorial abuse of fee forfeiture, like any other prosecutorial abuse of discretion, is readily available in the courts." Comment, 62 Wash.L.Rev. at 223. We do not assume that the government will abuse its discretion. Most significantly, none of the appellees contend that the government has used the forfeiture allegations to target a particular attorney in this case.

### C.

We are also aware of the ethical difficulties confronting an attorney who is representing a defendant whose property is subject to forfeiture. *See generally* Uelmen, *Converting Retained Lawyers into Appointed Lawyers: The Ethical and Tactical Implications,* 27 Santa Clara L.Rev. 1 (1987); Note, 54 Fordham L.Rev. at 1180–84; *see also Ianniello,* 644 F.Supp. at 457. A defendant has a constitutional right to be represented by an attorney who is not constrained by a conflict of interest that adversely affects counsel's performance. *See, e.g., Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980); *Holloway v. Arkansas,* 435 U.S. 475, 488, 98 S.Ct. 1173, 1180–81, 55 L.Ed.2d 426 (1978). Once again, however, the criminal forfeiture provisions are not unconstitutional on their face simply because of the potential for conflicts of interest they create. None of the appellees complain that their attorney has operated subject to a

---

14. The Department of Justice is aware of the concern that criminal forfeiture can be used to harass or target certain attorneys. *See* Dep't of Justice Guidelines at 3006. Accordingly, the Department has developed guidelines to standardize forfeiture allegation and to reduce the potential for abuse. *Id.* By their own terms, however, the guidelines are not enforceable at law. *Id.* at 3003.

conflict of interest. There has been no denial of the right to counsel in this case.

## VII. CONCLUSION

We hold that the right to choice of counsel does not prohibit the government from restraining potentially forfeitable assets before trial. This holding applies equally to criminal and civil forfeiture. By applying our holding to civil forfeiture, we do not imply that we sanction "the wholesale use of civil forfeiture proceedings" in the criminal context. *United States v. $39,000 in Canadian Currency*, 801 F.2d at 1219 n. 7. We adhere to the concerns expressed in *United States v. $39,000 in Canadian Currency. Id.* We hold only that neither criminal nor civil forfeiture violates the right to choice of counsel. We therefore reverse the decision of the district court and hold that 21 U.S.C. §§ 853 and 881 do not violate the sixth amendment.

The judgment of the district court is reversed. We remand to the district court for further proceedings consistent with this opinion.

## REVERSED AND REMANDED.

LOGAN, Circuit Judge, dissenting:

I agree with the majority opinion that the language of the Comprehensive Forfeiture Act (CFA), 21 U.S.C. § 853, does not permit the exemption of attorney's fees from otherwise forfeitable property. Congress appears to have intended to foreclose the use of such property for payment of attorney's fees to the extent the Constitution permits. I also agree with the majority that the case is in a posture requiring us to decide the constitutional issue. I cannot accept the majority's conclusion, however, that 21 U.S.C. § 853 is constitutional insofar as it forecloses persons accused of a crime from hiring counsel to defend against the accusation.

In deciding the constitutional issues presented by this case, we cannot be carried away by our emotional revulsion to drug dealers and others who make crime a way of life. The same analysis that today permits a pretrial seizure and then a forfeiture of the property of drug dealers may

be applied tomorrow to anyone who violates federal antitrust laws or laws prohibiting polluting the water or the air. Indeed, the reasoning of the majority would support a law forfeiting as of the date of the offense all of a person's property, for his or her lifetime, for any offense, assuming it could survive an Eighth Amendment proportionality test.

The majority opinion admits the hostility of our Founding Fathers to the English practice of forfeiture of estate. But in doing so it maintains that the only constitutional restriction on criminal forfeiture is in the admonition in Article III, § 3, that "no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attained." This provision standing alone clearly is not broad enough to prohibit what Congress has done by enacting the CFA. Thus, the majority and some other courts have permitted Congress, by the device of vesting property rights in the government as of the date the crime was committed, to prevent the person who would otherwise be the owner under our law (common law owner) from any use of the property until and unless that person is found innocent of the crime or the property is found not to be derived from the crime, not used or intended to be used in facilitating the crime or, for persons found guilty of engaging in a continuing criminal enterprise, not property "affording a source of control over" the enterprise. 21 U.S.C. § 853(a). Because the government's ownership attaches at the moment of the crime, the government can seize the property even before the common law owner is formally accused. By alleging that all of the common law owner's property is subject to forfeiture, the government can deprive him or her of use of any property to provide for a defense against the criminal charge. Presumably the government can prevent expenditures necessary to sustain life itself.

The majority here and the en banc majority of the Fourth Circuit, *see United States v. Caplin & Drysdale, Chartered*, 837 F.2d 637, 640 (4th Cir.1988), admit that the key to their analysis is the use of the relation-

back doctrine. The CFA employs this legal fiction to prioritize the government's claim and thereby legitimize a freeze of the defendants' use of their property at the time or even before the filing of an indictment. *See* 21 U.S.C. § 853(e). Such a freeze is thought necessary to protect the government's inchoate interest in the property, should the property be found forfeitable, against pretrial dissipation or conveyence by the defendants. Thus, the majority and the Fourth Circuit would elevate the government's status at the time of indictment to that of at least a coequal competitor to the common law owner, akin to a bank fighting with an accused robber over money allegedly stolen from the bank, or to a creditor fighting a debtor over property in which the creditor claims a lien. *See Caplin & Drysdale*, 837 F.2d at 640.

I see a significant difference between the situation at bar and the examples posed as analogous by the majority. The government's interest in the property allegedly subject to criminal forfeiture is of a different nature than the interest of a bank seeking to recover stolen currency or of a creditor claiming a lien against a debtor's property. The latter claims are based upon traditional common law property ownership concepts embedded in the Constitution.[1]

When a bank and an accused robber are fighting, even over funds that have changed form after the robbery, both are claiming to be the owners under traditional common law property concepts. When a creditor and debtor are litigating over property alleged to be subject to a lien, the creditor is asserting that it advanced consideration which created a debt under the traditional common law property system, and that either the debtor or the law has given the creditor a lien enforceable against the property to secure repayment of the debt. The government's jeopardy assessment for back taxes is not essentially different from the ordinary creditor-debtor situation.

The government's interest in forfeited property, on the other hand, does not derive from a common law ownership right to the property, for the government neither owned the property before the crime[2] nor gave value for the property as a creditor or purchaser does. Forfeiture, as an exception to the Fifth Amendment's requirement that property shall not be taken for public use without "just compensation," is grounded entirely upon public policy. Criminal forfeiture is a penalty, to prevent a criminal from profiting from crime or

1. The original text of the Constitution does not mention an "approved" system of property ownership except in the most oblique and offhand manner: references to Congress' power to give authors and inventors the exclusive right for a limited time to their writings and discoveries, Art. I, § 8; the prohibition on state laws impairing the obligation of contracts in Art. I, § 10; extending judicial power of federal courts to citizens "claiming Lands under Grants of different States," Art. III, § 2; the aforementioned "Forfeiture" reference in Art. III, § 3; and Congress' power to make rules respecting "Property belonging to the United States," Art. IV, § 3. It is clear, however, that the drafters of the Constitution assumed the fee ownership system developed in English law applied in the United States, and that the Constitution intended to recognize and approve these notions of property ownership. The Bill of Rights makes this explicit: the Third Amendment states that no soldier should be quartered during peacetime in any house "without the consent of the Owner"; the Fourth Amendment refers to the right of "people to be secure in their persons, houses, papers, and effects" against unreasonable searches and seizures; and especially the Fifth

Amendment recognizes the right of private ownership by declaring that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." The Fourteenth Amendment, applicable to the states, repeats the prohibition on deprivation "of life, liberty or property, without due process of law."

2. In 1066 William the Conqueror regarded himself as the personal owner of all of the land in England; this was the basic concept of the feudal system. He thereafter granted vast tracts to his tenants-in-chief, not as owners but literally as tenants who had a continuing relationship with their lord, the King. The tenants had to render continuing services to satisfy the terms of their tenancy, not the least of which were to provide the armies to support the throne. *See* A. Casner & W. Leach, *Cases and Text on Property* 251–52 (1951). Forfeiture of estates for treason arose out of this; the land reverted to the King. *Id.* at 257. No similar notion of the government reasserting title to property it always owned underlies the forfeitures at issue in the case before us.

from retaining the means to commit more crimes, or it is in the nature of a fine, to punish the criminal. *See, e.g.,* at 1487; *United States v. Busher,* 817 F.2d 1409, 1413 (9th Cir.1987) (forfeiture under RICO "is clearly 'punishment' as that term is used in the eighth amendment"); *see generally United States v. D.K.G. Appaloosas, Inc.,* 829 F.2d 532, 543–44 (5th Cir. 1987) (distinguishing criminal forfeiture, which is intended to be primarily penal in nature, from civil forfeiture, which is primarily remedial). The property law jargon borrowed by Congress—that "title vests" in the government on the date the crime is committed—does not alter the essentially penal basis and justification for the forfeiture. In my view, this distinction between the desire to punish and the protection of legitimately pre-existing property rights demands treating the property to which the government claims a right of forfeiture as different from the property of competing contestants who assert claims as rightful owners under common law property concepts.

Although the cases cited by the majority have gone far to uphold the relation-back doctrine, I know of no case until the recent CFA decisions in which a court has directly considered whether forfeiture might be limited by the Sixth Amendment right to counsel. *Miller's Executor v. United States,* 78 U.S. (11 Wall.) 268, 20 L.Ed. 135 (1870), cited by the majority to support the government's power to impose criminal forfeiture, upheld Civil War forfeiture acts only under the war powers of Congress; the Court conceded that if the acts were intended to punish crimes and were thus "municipal regulations only, there would be force in the objection that Congress has disregard-

ed the restrictions of the 5th and 6th amendments of the Constitution." *Id.,* 78 U.S. (11 Wall.) at 304, 20 L.Ed. at 144.

Unlike the forfeiture law in *Miller's Executor,* the CFA rests squarely and solely on the power of municipal regulation. The government's right to forfeiture is not based upon an explicit provision of the Constitution, but only upon Congress' power to prescribe criminal laws. Balanced against that are well-established and clearly enunciated constitutional rights: The accused has explicit Fifth Amendment rights to due process [3] and, as applicable to this case, Sixth Amendment rights to counsel.

The government's interests justifying forfeiture of a common law owner's property are only to deprive that person of the fruits of criminal activity, to confiscate the person's means to commit further crime, and to punish. Pretrial seizure is justified only to prevent dissipation or concealment.[4] Balanced against these interests is the accused's explicit Sixth Amendment right to counsel. This right includes the right "to secure counsel of his own choice." *Powell v. Alabama,* 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932); *see also United States v. Monsanto,* 836 F.2d 74, 80 (2d Cir.1987) ("right to counsel includes a right to privately retained counsel of choice"); *Linton v. Perini,* 656 F.2d 207, 209 (6th Cir.1981), *cert. denied,* 454 U.S. 1162, 102 S.Ct. 1136, 71 L.Ed.2d 318 (1982) (same). There can be no doubt that the normal understanding of the authors of the Sixth Amendment must have been that common law owners of property could use their property to hire counsel of their choice to defend them on a criminal charge. Further, the accused is entitled to a presumption of innocence, which in all normal cir-

---

**3.** The majority declines to consider whether the statutory scheme of *ex parte* restraining orders complies with due process, because defendants did not explicitly raise a due process argument in support of the district court's order. *See* at 1491 n. 4. I accept that disclaimer even though the majority opinion later comes close to approving the procedure. *Id.* at 1504–05. I do not agree that *United States v. Musson,* 802 F.2d 384 (10th Cir.1986), which involved a mere restriction on alienation, resolves all of the due process concerns. *See United States v. Monsanto,* 836 F.2d 74 (2d Cir.1987); *United States v. Thier,* 801 F.2d 1463 (5th Cir.1986).

**4.** Defendants here did not challenge the seizure of their property on Fourth Amendment grounds. It does appear, however, that they could present a colorable argument that the magistrate's issuance of an order restraining the defendants' use of property, solely upon the prosecution's presentation of an indictment, constituted an unconstitutional seizure of defendants' property. *See United States v. Thier,* 801 F.2d 1463, 1476 (Rubin, J., concurring); *see also United States v. Rubio,* 727 F.2d 786, 795 (9th Cir.1983).

cumstances would presuppose a right to use personal resources to defend against the charge. *See United States v. Thier*, 801 F.2d 1463, 1476 (5th Cir.1986) (Rubin, J., concurring).

The result of the majority's decision is that the government, at the time of filing a charge, or before, may seize an accused's assets, rendering that person a pauper dependent upon appointed counsel whose fees are limited to whatever amount the government authorizes.[5] Surely in such a case there is a drastic departure from the Sixth Amendment's original contemplation of the right to counsel. The majority takes solace in the fact that the Supreme Court has held that appointed counsel, paid under the Criminal Justice Act, are constitutionally adequate for indigent defendants. But that holding rests on an uneasy compromise of an ideal, required by the fiscal realities of government budgets and made minimally acceptable by the fact that most crimes are simpler than those now before us.

The majority apparently believes that permitting defendants to use funds subject to forfeiture somehow allows them to benefit from criminal activity; that payment to retained counsel who will cost more than the government would pay for an indigent's appointed counsel is an unlawful burden upon the government's interest in the property. In my view, equating the ability to raise a defense to a "benefit" of crime is like considering the right to a jury trial a benefit of being accused of murder. But even if we accept the majority's characterization, such a benefit is justified to preserve what I believe are important constitutional concerns with the proper role of defense counsel in our adversary system of justice. Thus, I agree with Judge Jenkins' conclusion below, *see United States v. Nichols*, 654 F.Supp. 1541, 1558 (D.Utah 1987). *See also* the dissents of Judge Oakes in *Monsanto*, 836 F.2d at 86–87, of

Judges Phillips, Winter, Sprouse and Ervin in *Caplin & Drysdale*, 837 F.2d at 652, and Judge Rubin's concurrence in *Thier*, 801 F.2d at 1475–77.

I do accept that the government has a sufficient interest under the CFA and other forfeiture statutes to prevent pretrial disposition of property that is the alleged fruit of a crime for purposes other than retaining counsel. I agree that the government has sufficient interest to prevent payment of more than reasonable fees. Further, I believe that if the accused has nonforfeitable assets from which to pay counsel, he or she may be required to use those funds instead of the frozen assets. But when the assets in which the government claims a forfeited interest are the only property available to pay reasonable fees of defense counsel of the accused's choice, surely the explicit Sixth Amendment rights should outweigh the government's interest in the forfeiture of those sums, regardless of the eventual outcome of the trial.

For the reasons stated, I dissent.

---

**5.** An accused who has no funds as a practical matter will not be able to hire a lawyer. A retained lawyer who takes money from a person accused in a forfeiture case has no defense under the majority's holding if the money paid the lawyer is deemed forfeitable property. Further, assignment of an interest in funds the government seeks to forfeit would seem to be improper as legal ethics forbid a lawyer from taking a criminal case on a contingency basis. A.B.A. Model Code of Professional Responsibility DR 2-106(C); A.B.A. Model Rules of Professional Conduct Rule 1.5(d)(2).